**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **SHELLEY GIPSON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NO. 4:22-cv-00730-P** |
| | ) | |
| **WEATHERFORD COLLEGE OF THE** | ) | |
| **PARKER COUNTY JUNIOR** | ) | |
| **COLLEGE DISTRICT** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>FIRST AMENDED COMPLAINT</u>
<u>(Demand for Jury Trial)</u>**

Shelley Gipson ("Gipson" or "Plaintiff") files this First Amended Complaint, seeking damages from Weatherford College of the Parker County Junior College District ("Defendant" or "Weatherford College") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. For these causes of action, Plaintiff states as follows:

**PARTIES**

1.      Plaintiff  is a female who resides in Aledo (Parker County), Texas.

2.      Defendant Weatherford College is a public community college district organized under the laws of the State of Texas, with its principal place of business and primary campus located in Parker County, Texas. Defendant has been served and has already appeared and answered in this matter.

## JURISDICTION AND VENUE

3.      Plaintiff seeks relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1331.

4.      At all times material hereto, Defendant Weatherford College conducted business in Texas and was doing business in the State of Texas by employing Plaintiff in Weatherford, Texas. The causes of action asserted herein arose from and are connected to purposeful acts committed by Defendants during Plaintiff's employment in Weatherford, Texas.

5.      A substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in Parker County, Texas. Venue is proper in this district and division under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES AND REMEDIES

6.      Plaintiff timely filed with Equal Employment Opportunity Commission ("EEOC") a charge of discrimination and retaliation against Defendant Weatherford College. Plaintiff received a notice of her right to sue from the EEOC and timely filed this Complaint within those 90 days of receiving that notice of right to sue.

## FACTUAL BACKGROUND

7.      Defendant claims to be the oldest continuing community college in the State of Texas, with approximately 10,000 students enrolled each year in credit and non-credit courses.

8.      Plaintiff was employed by Weatherford College from September 14, 2020 until July 26, 2021.

9.      Defendant Weatherford College is an "employer" as that term is defined in 42 U.S.C. § 2000e(b).

*Plaintiff is Offered Employment with Defendant*

10.     Prior to working for Defendant, Plaintiff knew and was friends with Kathleen Farmer, the wife of Defendant's President Tod Allen Farmer. Plaintiff had taught elementary school at the same school (Stuard Elementary) as Ms. Farmer in Aledo, Texas for approximately 10 years, before Ms. Farmer resigned in 2020.

11.     On August 3, 2020, Plaintiff called Ms. Farmer to let her know that Plaintiff also had recently resigned from Stuard Elementary.

12.     Ms. Farmer notified her husband—Dr. Tod Allen Farmer, the President of Defendant Weatherford College—that Plaintiff had left Stuard Elementary. Ms. Farmer then called Plaintiff, indicating that Dr. Farmer had a position in mind for her at Weatherford College.

13.     Dr. Farmer told Plaintiff that he was looking for someone to work with him in the President's office at Weatherford College. More specifically, Dr. Farmer told Plaintiff that he had been looking for someone "perfect" for this position and knew that Plaintiff was that person.

14.     According to the job description that Dr. Farmer personally provided to Plaintiff, the position would be responsible for (among other things): supporting various fundraising events; attending lunch meetings with donors and VIPs; attending various civic group meetings as a college representative; supporting the College president in various external relations activities; attending banquets as a college representative; attending chamber lunch meetings as a college representative; supporting lobbying efforts with elected officials and state agencies; supporting the president with board of trustee relations; supporting the president during various speaking engagements; developing professional relationships with Weatherford College Foundation board members; attend meetings on behalf of the president; assisting with recruiting and retention efforts; and other duties as assigned.

15.     Based on their prior acquaintance, Dr. Farmer knew that Plaintiff was neither dating nor married.  Dr. Farmer said that since Plaintiff was single, she would be "wonderful" for the position because she could attend all of the evening events and not be away from family or a significant other.

16.     Dr. Farmer extended an offer to Plaintiff to fill the position. Although he had initially planned to have Plaintiff report to him directly in the position of Assistant to the President, Dr. Farmer told Plaintiff that he could not title her position as "Assistant to the President" due to concerns about "his wife" and a member of the College Board of Trustees. Thus, Plaintiff was hired with the title of External Relations Officer.

***Plaintiff Begins Working at Weatherford College***

17.     On September 14, 2020, Plaintiff began her employment at Defendant.

18.     On that first day, Dr. Farmer shared with Plaintiff that his wife was angry that he had hired Plaintiff, after she had asked him not to do so. Plaintiff was sitting in Dr. Farmer's office when he received a text from his wife regarding an email to College faculty introducing Plaintiff. Dr. Farmer made the comment, "Uh oh she's angry,"  indicating to Plaintiff that his wife was upset.

19.     On September 17, 2020, Dr. Farmer informed Plaintiff that his wife did not want Plaintiff to be hired and did not want Dr. Farmer around Plaintiff. Dr. Farmer asked Plaintiff to not have her picture taken with him at the new employee luncheon the following day, contrary to customary protocol. Working directly with the College president, Plaintiff assumed that pictures would be taken of them together at various events throughout the year, yet she later learned that she was not to be in any pictures with Dr. Farmer.

20.     That evening, Dr. Farmer texted Plaintiff to tell her to wear comfortable shoes for walking because they would be taking a walking tour the following day. Plaintiff replied back "Thank you! Was just talking to [Dr. Farmer's secretary] Theresa about what the attire is like on Fridays." Dr. Farmer texted back, "You will make any attire shine. See you in the morning ☺"

21.     Plaintiff was also told multiple times by Dr. Farmer that they could not walk in front of the Financial Aid office together (when touring the campus). Ms. Farmer's best friend worked in the Financial Aid office and Dr. Farmer indicated to Plaintiff that the two of them could not be seen together.

22.     On September 18, 2020**,** Dr. Farmer claimed to have had a toothache and did not arrive at the new employee luncheon until just prior to the start time. Plaintiff spoke with Dr. Farmer in his office following the luncheon and asked how he was doing. Dr. Farmer appeared upset and asked Plaintiff why she had sent "that message" to his wife.

23.     Plaintiff was unaware of any text message to Ms. Farmer and asked Dr. Farmer what he was talking about. Dr. Farmer stated that his wife woke him up during the night, claiming to have a screenshot of Dr. Farmer's text to Plaintiff remarking how she would "shine in any attire." Plaintiff explained that she had not texted anything to Ms. Farmer since August. Dr. Farmer then concluded that his wife must have access to his phone.

24.     Dr. Farmer informed Plaintiff that they could never text each other again, even though Dr. Farmer continued communicating with other College employees through texts. Dr. Farmer further told Plaintiff that all communication had to be conducted in person or by telephone and that there should be no emails and no texts, presumably to minimize the likelihood of his wife accessing any written communications between Dr. Farmer and Plaintiff. This impediment made Plaintiff's job responsibilities more difficult to perform.

*The Workplace Becomes Even More Hostile*

25.      During Plaintiff's second week on the job, she sat at the desk of Dr. Farmer's secretary, who was on vacation that week. The Vice President of Institutional Advancement's secretary (Evelyn) worked in the same office and planned to teach Plaintiff how to use the phone system. Plaintiff received two "hang up" calls during the day.

26.      Plaintiff arrived at work the next day and was instructed by Dr. Farmer to go to her office and remain there because his wife had called twice the prior day and Plaintiff had answered the phone. Dr. Farmer stated to Plaintiff that his wife "wanted that bitch gone!" (referring to Plaintiff).

27.      On the afternoon of September 22, 2020,  Dr. Farmer called Plaintiff on his cell phone and told her to leave work "immediately." Dr. Farmer instructed Plaintiff to take a different path to her car because his wife was on her way to confront Plaintiff and indicated that he was trying to stop her. Plaintiff was instructed by Dr. Farmer to leave the campus immediately because he was not sure what his wife would do.  This situation caused Plaintiff a great deal of anxiety and stress.

28.      On or about September 25, 2020,  Dr. Farmer asked Plaintiff to not attend the College's Roo Kickoff (the beginning-of-year school pep rally event) because her attendance would upset his wife.  Plaintiff had previously been asked to attend the event (along with Dr. Farmer and the Associate Dean of Student Development), as it was an opportunity to meet other community members and networking was a significant part of the position for which she was hired. Instead, at Dr. Farmer's request, Plaintiff remained at the office.

29.      On the morning of September 30, 2020, Plaintiff was instructed by Dr. Farmer not to attend the College golf tournament (another networking opportunity) the following day because,

6

according to Dr. Farmer, he was worried that his wife would cause a scene and physically attack her.  Later that evening, Dr. Farmer called Plaintiff to let her know that she could now attend the golf tournament. However, Dr. Farmer instructed Plaintiff not to take any pictures with him and to stay at a distance away from him. Dr. Farmer stated that his wife had decided that she did not want to assume the tasks that Plaintiff was to have performed at the event and, instead, instructed Dr. Farmer to call Plaintiff and have her attend after all.

30.     During that first month of her employment in September 2020, Dr. Farmer shared other things with Plaintiff that were disturbing, including personal details regarding his wife and the marriage.   For example, Dr. Farmer told Plaintiff that his wife is on medication and that Plaintiff should just give her time to adjust. According to Dr. Farmer, his wife had just started the medications and was in counseling.

31.     Dr. Farmer also stated to Plaintiff that he was trying to get her past the 3-month probationary period and told her that she needed to "just hang on." Dr. Farmer told Plaintiff that his wife wants to "rip [Plaintiff's] hair out" and that she hates Plaintiff's blonde hair. Dr. Farmer also told Plaintiff that his wife wanted  to punch Plaintiff in the face.

32.     According to Dr, Farmer, his wife had supposedly hired a private investigator to find evidence of marital infidelity by Dr. Farmer and believed that that Dr. Farmer and Plaintiff were romantically involved (which was entirely untrue).

***The Behavior Continues***

33.     In late September or early October 2020, Plaintiff was asked to move her parking spot away from the MINCE administration building at the campus. According to Dr. Farmer, his wife was upset that Plaintiff was parking at the MINCE building because Plaintiff was "not supposed to be working for Dr. Farmer."  Plaintiff had been parking at the MINCE building so

7

that she could check in each morning with Dr. Farmer and Theresa and then walk over to her office in the BOYD building. Plaintiff agreed to park at a different campus location, in an effort to avoid further problems with Dr. Farmer and his wife.

34.    On October 2, 2020, Plaintiff was scheduled (along with Dr. Farmer) to attend the annual Pink Lunch, an event supporting and benefitting breast cancer awareness month. Prior to the event,  Dr. Farmer instructed Plaintiff again not to sit near him, not to speak with him, not to take pictures with him, and to keep her distance.

35.    On October 8, 2020, Dr. Farmer stated to Plaintiff that his wife had a problem with Plaintiff becoming friends with his secretary (Theresa), the Vice President of Institutional Advancement's secretary (Evelyn), and the Director of Communications and Public Relations (Crystal) because his wife believed that she was "turning them against her."  Dr. Farmer further stated to Plaintiff that his wife was on campus to take pictures of Dr. Farmer and Plaintiff together in order to "catch them in the act." He said that his wife was coming later that day to take pictures of Plaintiff during a meet and greet with members of the College's Board of Trustees.

36.    Dr. Farmer told Plaintiff that his wife came by campus the prior day ostensibly to drop off his gym bag (even though he was not going to the gym that day).  According to Dr. Farmer, the real purpose of the visit was actually to catch the two of them (Dr. Farmer and Plaintiff) together.

37.    Plaintiff informed Dr. Farmer that the constant discussions regarding his wife were making her anxiety worse and impacting her physical and emotional health, and she requested that their conversations be limited to work at the College or she would not be able to continue working there.  Dr. Farmer agreed that he would not bring it up anymore.

8

38.     The Presidential Luncheon was held on October 9, 2020 on campus.  Before the groundbreaking ceremony, Dr. Farmer instructed Plaintiff to ensure that the seats for his family were in a specific order, because his wife had specially refused to sit beside him.  At the ceremony, the seating arrangement was out of order and Ms. Farmer refused to sit by Dr. Farmer, so his children stood in the back with Ms. Farmer. Dr. Farmer later questioned Plaintiff regarding what happened with the seating arrangements and stated that he was embarrassed because four seats next to him were vacant at the ceremony.

39.     On or about October 12, 2020**,** Dr. Farmer stated to Plaintiff that he would honor Plaintiff's request regarding not speaking about his wife's hatred of Plaintiff, but also indicated during that conversation that things were still bad at his home.

40.     The Weatherford College Rodeo was scheduled for October 24, 2020, at the Parker County's Sheriff's Posse. Prior to the event, Plaintiff informed Dr. Farmer that she would be unable to attend due to a prior engagement. Dr. Farmer expressed great relief, stating that Plaintiff's attendance would have caused more issues at home and that he was thankful that he did not have to ask her not to attend.

41.     On October 27, 2020, there was a planning meeting for the annual Jack Harvey Event. Leading up to the meeting, Plaintiff and Dr. Farmer had numerous conversations regarding Dr. Farmer's selection of Plaintiff as the lead team member at the event. However, just prior to the event, Dr. Farmer informed everyone that a secretary (Kim Kelley) would now be the lead team member at the event.  Dr. Farmer explained to Plaintiff that he was hoping that his wife would be happy to see that he "demoted" Plaintiff's role at the Jack Harvey Event.

42.     Plaintiff was invited to attend the 2020 Masked Ball at the Diamond H3 Ranch event, along with Dr. Farmer's secretary (Theresa) and the Vice President of Institutional

Advancement's secretary (Evelyn). Dr. Farmer told Plaintiff that his wife was upset that Plaintiff would be attending the Masked Ball because, in her view, Plaintiff "did not deserve the $100 place setting." According to Dr, Farmer, his wife told him that he "was the president of the College and HE could do something about that!"

43.     Plaintiff was also told around this time that Dr. Farmer's wife had prepared a list of ultimatums for him. Dr. Farmer stated that he was still living at home with his wife, but that they were in separate bedrooms. He also told Plaintiff that his wife was demanding that he move out of the house once his twin children turned 18 (on November 3, 2020) because she would be filing for divorce.

44.     During October 2020, Dr. Farmer continued to make comments to Plaintiff that created even more awkwardness. For example, Dr. Farmer expressed concern to Plaintiff about his wife hiring a lawyer and indicated that he was concerned that he might have to leave Weatherford College. Dr. Farmer made a point, however, to tell Plaintiff that, if she (Plaintiff) were to stay with him if he left Weatherford College, he would ensure that she was paid well and "taken care of."

45.     Also around that time, the President's office and Foundation's office were to be moved to a new building that the College had recently obtained.  Dr. Farmer stated to Plaintiff that he wanted her (Plaintiff) to be in the office immediately next to him, as  she needed to be as close as possible to him so that "he could hear her giggles."

46.     In November 2020, Plaintiff contracted COVID and was out sick for approximately 2 weeks (from November 3 through November 17).  At that time, Plaintiff had not yet met the eligibility requirements for enrollment in the College's health insurance benefit plan and was therefore without health insurance. During a telephone conversation with Plaintiff while she was out sick, Dr. Farmer told Plaintiff that, if she ended up requiring hospitalization, he would

"take care of everything financially and no one would need to know." Plaintiff told Dr. Farmer that would not be necessary and that her family would be able to take care of everything.

47.     When Plaintiff returned from COVID leave on November 18, 2020, Dr. Farmer felt compelled to share with Plaintiff that his wife thought Plaintiff should have been fired for missing so much work due to COVID.

### *Dr. Farmer Finally Articulates His True Intentions*

48.     The College's Annual Employee Award Dinner was held on December 4, 2020. After the dinner, Dr. Farmer told Plaintiff that his wife was insisting to him that Plaintiff was not wearing a bra under her white blouse. This statement by Dr. Farmer was absolutely false and only served to make Plaintiff extremely upset.

49.     The following week, Dr. Farmer and Plaintiff met to discuss a virtual Christmas card distribution list and details regarding the Habitat for Humanity event at the College.  Dr. Farmer's wife had apparently learned from Dr. Farmer's calendar that Plaintiff would be attending the Habitat for Humanity event. Dr. Farmer informed Plaintiff that he had decided that he and Plaintiff would need to attend at separate times because his wife had threatened to show up to the event and make a scene.

50.     At that same meeting on December 10, 2020, Dr. Farmer appeared flustered to Plaintiff and was stumbling over his words. After Plaintiff inquired if something was wrong, Dr. Farmer indicated that he wanted to know if they (Dr. Farmer and Plaintiff) were ever going to be "more than professional." Plaintiff responded: "I don't understand. Are you asking if this is going to be a personal or professional relationship?" Dr. Farmer responded: "Yes." Plaintiff stated: "No, this is only going to be professional." Dr. Farmer then stated: "Well, this is awkward."

51.     Following that exchange, the meeting ended abruptly. Plaintiff left the meeting with great anxiety and concerns regarding about the future of her position and employment at Defendant Weatherford College, having flatly rejected the advances of the College's President Dr. Farmer.  It did not take long before those concerns were validated.

***The Aftermath of Dr. Farmer's Romantic Overtures***

52.     On the morning of December 15, 2020 – a mere 5 days after the incident where Dr. Farmer inquired about a personal relationship with Plaintiff, and in the first communication between Dr. Farmer and Plaintiff since that fateful meeting—Plaintiff received an email from Dr. Farmer instructing her to report directly to the Financial Aid office. Plaintiff showed up at the Financial Aid office, yet no one (including Plaintiff) had any understanding as to why she was instructed to report there.  When Plaintiff inquired, Dr. Farmer told her they needed help down there and that she was to "just go help them."

53.     Dr. Farmer's interactions with and demeanor toward Plaintiff changed substantially after the December 10 meeting. The two of them went from having daily conversations regarding work activities to barely having any communications at all.

54.     In January 2021, Dr. Farmer was out sick with COVID. On January 26, 2021, the day after he returned to work following his COVID infection, Plaintiff called Dr. Farmer to see what work she could perform for him (as she had since resumed her original job duties.)  Dr. Farmer was very short and aloof and told Plaintiff that an employee in the Guided Pathways initiative at the College had cancer. Dr. Farmer instructed Plaintiff to go "help out over there." Dr. Farmer also told Plaintiff that he or someone else would come tell her officially what she was supposed to do now.

55.     The following day (January 27, 2021), Plaintiff was instructed to report to Student Services to help with diplomas and various other student services. Plaintiff was told that it had not been decided yet if this was a temporary or permanent assignment for her, and Plaintiff packed her things and reported to Student Services.

56.     On February 2, 2021, Plaintiff learned indirectly (through a co-worker) that she would be moving to a new position in the Welcome Center to advise students.

57.     On or about February 4, 2021, after the encouragement from a co-worker, Plaintiff met with Defendant's Title IX compliance officer to officially report the workplace harassment and discrimination that she had been experiencing. Plaintiff described all of the events and conduct that she could remember at the time, including the most recent re-shuffling of her job functions and worksites around campus following her rejection of Dr. Farmer's advances. Plaintiff then met with a representative from the College's Human Resources department to convey the same information, at which time she was told that Human Resources would begin an investigation.

58.     On February 5, 2021 (the day after she reported the harassment to the Title IX compliance officer and Human Resources), Dr. Farmer approached Plaintiff who was making preparations and setting up for the upcoming Jack Harvey Event. Dr. Farmer approached her angrily waved his hands at her and told her to "Chill out and just relax!"  Dr. Farmer then stated that the College was in a financial crisis (implying that complaints of harassment against the President during such time would only worsen the situation) and that he would be sending the "nicest and best furniture" over to her at the Welcome Center position.

59.     Incidentally, Plaintiff never received the furniture, nor did she ever ask for it or want it.

60.     On or about February 7, 2021, Plaintiff's re-assignment to the Welcome Center become a permanent relocation and she was moved to the position/title of Assistant Director of Student Pathways.

61.     Between December 15, 2020 and July 2021, Plaintiff was relocated and re-assigned 5 different times, each time with no training or direction. Yet, while reporting for these additional assignments, Plaintiff continued to perform her original job responsibilities as assigned. Plaintiff rarely took lunch breaks because she was given so much work to complete, between her new positions/assignments and her original position assignments.

62.     Plaintiff was called to meet with Dr. Farmer at the end of June 2021. Plaintiff felt uncomfortable meeting with Dr. Farmer alone and asked Human Resources if she was required to meet with him by herself, or if she was permitted to bring someone with her.  Plaintiff was informed by Human Resources that her current supervisor—the Director of Student Pathways (Dawn)—could accompany her to the meeting with Dr. Farmer.

63.     When Dr. Farmer learned that Plaintiff would be bringing her current supervisor to the meeting, he called that supervisor and informed her that there might be some personal and uncomfortable topics that could be discussed come up. Although it was apparent that Dr. Farmer wanted to meet with Plaintiff alone, he told the supervisor that he simply wanted to make sure she (the supervisor) was comfortable with that fact.

64.     On July 1, 2021, Plaintiff and her supervisor went to meet Dr. Farmer in his office at the Kingsley building. Plaintiff was informed at that meeting that she was going to be moved back to Financial Aid, ostensibly because an employee in that department had cancer and would be out, creating the need for extra help in that office. When Plaintiff questioned why she was being moved around so much, Dr. Farmer stated that he should have done a better job of being a boss

14

and "educating [Plaintiff] on the politics of the college." His comment made it clear that her complaint of harassment and retaliation against him to Human Resources and the Title IX compliance officer did not sit well with him.

65.     Plaintiff continued to suffer—and continues to suffer—severe anxiety and stress over the string of events and Dr. Farmer's conduct and behavior. To further compound the situation, Plaintiff was never notified of any results or conclusions from any Title IX or Human Resources investigation, leading her to believe that no such investigations were ever conducted. Instead, she was lectured regarding "campus politics" by the President of Weatherford College (the very person who had inflicted the harassment and retaliation) and re-assigned and relocated around campus in an effort designed create an unbearable situation for her or any reasonable individual.

66.     After trying in vain to cope with the situation and the College's abysmal failure or refusal to remedy that situation,  Plaintiff  concluded that the situation would never improve. Plaintiff decided that she could no longer continue working there to the detriment of her mental and physical well-being. The stress and anxiety had become too much to bear. Plaintiff submitted her resignation letter to Defendant on July 20, 2021 and her last day was July 26, 2021, having been constructively discharged.

67.     There should be no doubt regarding Dr. Farmer's unrequited romantic interest in Plaintiff, nor his level of frustration and retaliatory intent following Plaintiff's rejection and her stated desire to have a normal, professional relationship. Other comments that Dr. Farmer made throughout Plaintiff's employment at Defendant include the following:

- After the Masked Ball event at the end of October, Dr. Farmer told Plaintiff that she should be the next bachelorette the following year for the Parker County fundraising event and stated that Plaintiff "better remember who found [her] first."

15

- Dr. Farmer told Plaintiff repeatedly that his wife was jealous of blondes like her (Plaintiff).

- Dr. Farmer would inappropriately share private and intimate details regarding his marriage and his wife, for example, that she had multiple times threatened to kill herself by hanging herself with a dog leash, that she had thrown a wine bottle at him (Dr. Farmer) and shattered a picture window, and that he (Dr. Farmer) had slept in his car or a hotel on numerous occasions.

- Dr. Farmer stated that he told his wife that he found Plaintiff attractive, while they were in the car driving. According to Dr. Farmer, his wife opened the car door in order to jump out and kill herself, but Dr. Farmer grabbed her arm to prevent her from doing that.

- Dr. Farmer told Plaintiff on numerous occasions about women that found him attractive over the years that he has had to turn down. One was the wife of a Vice President who works at Weatherford College and another was a board member who "came on to him."

- Dr. Farmer once told Plaintiff that he was caught by his secretary (Theresa) "gazing into [Plaintiff's] beautiful blue eyes too long."

- Once Dr. Farmer commented on some open-toe shoes that Plaintiff was wearing, stating "You cannot wear those shoes in front of me!" When Plaintiff apologized, Dr. Framer responded: "Oh no it was meant to be a compliment."

- Dr. Farmer told Plaintiff on multiple occasions that he enjoyed their conversations and that it was "nice to carry on a normal conversation without being screamed at."

68.     The entirety of Dr. Farmer's comments and conduct directed toward Plaintiff—apart from sullying the office of the President of Weatherford College—were wholly inappropriate and entirely unwelcome, and did nothing but create a hostile and untenable work environment which neither Plaintiff nor any reasonable individual could be expected to endure.

## CAUSES OF ACTION

### A.    Count One: Sexual Harassment under Title VII

69.     Plaintiff repeats and realleges, as if fully set forth herein, the allegations of the preceding paragraphs.

70.     Plaintiff alleges that Defendant as Plaintiff's employer subjected her to a sexually hostile work environment in violation of § 42 U.S.C. § 2000e-2 *et seq*.

71.     Plaintiff is a member of a protected class (female). Plaintiff was subjected to unwelcome verbal conduct of a sexual nature which continued between September 14, 202 through her constructive discharge on July 26, 2021. 42 U.S.C. § 2000e(f).

72.     Defendant is an employer within the meaning of Title VII. 42 U.S.C. § 2000e(b).

73.     All conditions precedent to filing this action for discrimination under federal law have been met.

74.     Defendant, by and through the actions of its President Tod Allen, violated Title VII, as amended, by harassing Plaintiff and/or creating a hostile work environment, and/or discriminating and/or retaliating against Plaintiff in connection with compensation, terms, conditions or privileges of employment because of Plaintiff's gender.

75.     Defendant, by and through the actions of its President Tod Allen, maliciously and recklessly violated its own established rules and procedures to inflict pain and suffering upon the Plaintiff.

76.     Defendant allowed a sexually hostile work environment that targeted female employees to persist.

77.     Plaintiff complained about the sexual conduct in accordance with Defendant's policies and procedure but her complaints were ignored and Defendant failed or refused to

investigate. Defendant failed to exercise reasonable care to prevent the aforementioned and described sexual harassment and sexually hostile work environment from occurring.

78.     Plaintiff would not have been subjected to the harassment but for her gender, as evidenced by the type of remarks and conduct directed towards her.

79.     The harassment of which Plaintiff complains was severe and pervasive and altered the terms and conditions of her employment and created a hostile and abusive work environment.

80.     Plaintiff complained of the harassment to Human Resources in accordance with Defendant's policy and procedures. Defendant knew or should have known about the harassment and failed to take prompt remedial action.

81.     Defendant failed to exercise reasonable care to prevent the aforementioned and described sexual harassment and sexually hostile work environment from occurring. Defendant further failed to exercise reasonable care to correct promptly the aforementioned and described sexually harassing behavior.

82.     As a direct and legal result of the acts and conduct of Defendant,  Plaintiff has been caused to and did suffer and continues to suffer severe anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

83.     Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42 U.S.C. § 2000e-5(k).

84.     Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for emotional pain and suffering, inconvenience, loss of enjoyment of life and other nonpecuniary losses.

85.     Plaintiff requests relief as described in the Prayer for Relief below.

**B.      Count Two: Retaliation Under Title VII**

86.     Plaintiff repeats and realleges, as if fully set forth herein, the allegations of the preceding paragraphs.

87.     Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII.

88.     Plaintiff engaged in protected activity by, among other things, complaining about the sexual harassment of Defendant's President Tod Allen Farmer and participating in the investigation process for that complaint.

89.     Plaintiff reasonably believed the situation involving Defendant's President Tod Allen Farmer constituted (1) unlawful discrimination on the basis of sex, race, national origin, and/or religion, (2) a hostile environment, and (3) unlawful retaliation by Defendant.

90.     Plaintiff suffered numerous adverse actions, including but not limited to, the reduction of her on-the-job responsibilities, harassment, a hostile work environment, and ultimately, constructive discharge.

91.      Defendant, through the illegal actions of its President Tod Allen Farmer, retaliated against Plaintiff by subjecting her to a hostile work environment and materially altering the conditions of her employment and, further, by constructively discharging Plaintiff for her actions in complaining about the conduct of Farmer.

92.     There was a causal connection between Plaintiff's participation in the protected activities described above and the adverse employment decisions Defendant made against Plaintiff. But for the fact that the Plaintiff engaged in these protected activities, Plaintiff would not have suffered the adverse employment actions.

93.     The employment practices complained of above were intentional.

94.     As a result of Defendant's retaliatory conduct, Plaintiff has suffered and will continue to suffer compensatory damages which were a natural, probable and foreseeable result of Defendant's actions.

95.     Such discrimination by Defendant against Plaintiff was intentional and, as a result of Defendant's retaliatory conduct, Plaintiff has suffered nonpecuniary losses, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses for which she  seeks recovery under Title VII.

96.     Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

97.     As a result of Defendant's acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit, including reasonable expert fees, as provided in Title VII of the Civil Rights of 1964, as amended.

98.     Plaintiff requests relief as described in the Prayer for Relief below.

## JURY DEMAND

99.     Plaintiff demands a trial by jury as to all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shelley Gipson respectfully requests that on final trial, judgment be granted against Defendant Weatherford College of the Parker County Junior College District, awarding Plaintiff the following:

a.      Actual damages;

b.      Compensatory damages, in the maximum amount allowed by law;

c.      Prejudgment and post-judgment interest, in the maximum amount allowed by law;

d.      Attorneys' fees, expert fees, and costs of suit; and

e.      Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted November 9, 2022.


                                        */s/ Kevin M. Duddlesten*_____
                                        Kevin M. Duddlesten
                                        Texas Bar No. 00793644
                                        DUDDLESTEN LAW GROUP, PLLC
                                        4347 W Northwest Hwy Ste 130, PMB 325
                                        Dallas, TX 75220
                                        Phone: (214) 833-5228
                                        Facsimile: (469) 457-6785
                                        Email: kevin@duddlestenlawgroup.com

                                        ATTORNEYS FOR PLAINTIFF



                            **<u>CERTIFICATE OF SERVICE</u>**


        I certify a true and correct copy of the foregoing document was filed electronically on November 9, 2022. Parties may access this filing through the Court's system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


                                        */s/ Kevin M. Duddlesten*_____
                                        Kevin M. Duddlesten